UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **parcelpioneerlogistics@hotmail.de** THAT IS STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION | Mag. No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Addie C. Gilestra being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.   I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Microsoft Corporation, an e-mail provider headquartered at One Microsoft Way, Redmond, Washington, 98052.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require Microsoft Corporation to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.   The information requested in this search warrant is being sought pursuant to a request for assistance ("Request") from the Federal Office of Justice in Bonn, Germany, transmitted to Washington, D.C., on or about November 6, 2017.  Authorities in Germany are

conducting a customs and tax fraud investigation concerning violations of the criminal laws of Germany, specifically sections 370 and 373 of the German Fiscal Code and section 53 of the German Criminal Code. A copy of the applicable laws is appended to this affidavit.

3. The Request is made pursuant to the Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-F.R.G., Oct. 14, 2003, S. TREATY DOC. NO. 108-27 (2004), as supplemented by the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-F.R.G., April 18, 2006, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Treaty"). Under the Treaty, the United States is obligated to render assistance in response to this Request.

4. I am a Special Agent with the Federal Bureau of Investigation, and have been since 2009. I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit. My current duties include responding to requests from foreign governments pursuant to Mutual Legal Assistance Treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received for relevance in compliance with the parameters of the search warrants.

5. My past assignments included conducting investigations related to narcotics trafficking, violent crimes, racketeering, child exploitation and child pornography. I have extensive experience in the execution of search warrants and the analysis of collected evidence. Additionally, I have received training in the operation of computers and the collection and handling of digital evidence.

6. The facts set forth in this affidavit are based upon information conveyed to the United States via a request made pursuant to the Treaty by authorities in Germany and upon my

training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the criminal laws of Germany have been committed by Yingmei Tan ("Tan"), Kar Ket Yuen ("Yuen"), Jailiang Zhou ("Zhou"), and Wing Wai Shek ("Shek"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512 . . . ." 18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"), § 3512(c)(3) ("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

9. This application to execute Germany's request has been approved and duly authorized by an appropriate official of the Department of Justice, through the Office of

International Affairs ("OIA").[1]  *See* 18 U.S.C. § 3512(a).  An OIA attorney has authorized the undersigned to file this application.

## PROBABLE CAUSE

10.     Authorities in Germany are investigating German citizens Tan and Yuen as well as their accomplices Chinese citizen Zhou and British citizen Shek for tax evasion.  According to the Nuremberg customs office which began investigating this matter in 2013, since at least 2011, the four suspects operated a scheme depriving the German government of more than one million Euros in unpaid taxes.

11.     According to the Nuremburg customs office investigation, Zhou sold camera and PC accessories and other goods from China to Germany through eBay and Amazon.de.  To allow for more efficient delivery, the suspects established companies in Germany to handle the logistics.  Zhou was shareholder and managing director of the company BPS GmbH.  Tan has sole commercial power of representation for BPS GmbH ("BPS").  Tan also has general commercial power of representation for the company Parcel Pioneer Logistics UG ("Parcel").  Shek is shareholder and managing director of this company.  Both companies were originally registered with addresses at Riedingerstrasse 16 in Bayreuth, Germany, beginning July 20, 2011.  They both changed in January 2015, to Sophian-Kolb-Strasse 11, also in Bayreuth Germany.  Tan, Yuen, and Shek supported Zhou's sales from China by managing the companies BPS and Parcel.

---

[1] The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters.  *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81A and 81B (2015).

12. The companies' headquarters included a warehouse where the products were imported, held in storage, and then assembled and shipped to customers. When the goods were imported to Germany, an import sales tax based on the purchase price of the goods was due.

13. On September 13, 2013, customs officials in Nuremburg noticed a discrepancy between the reported value of a shipment and its actual value. Parcel had registered the shipment and declared the value at USD 609.00. However, the customs authorities determined that the actual value was EUR 7,365.00 (approximately USD 9,080.99).

14. German authorities reviewed the suspects' filings between August 26, 2011 and December 17, 2013, and compared the code numbers for the products identified on the tax forms to a list of the average customs values for those items. Through this analysis, it became apparent that the suspects filed tax documents and customs declarations for BPS and Parcel that significantly undervalued the goods being imported declarations such that the assessed customs duties and import sales taxes were far lower than they should have been based on the goods' actual assessed value.

15. According to German authorities, at the end of 2013, the suspects changed tactics and instead imported the goods through the Netherlands. As demonstrated by customs declarations, when the goods arrived in Germany, Parcel and BPS reported the products as intra-community goods from the Netherlands rather than from China and again the actual value of the goods was at least three times higher than the amount declared by the suspects on customs forms.

16. In particular, German authorities have identified 96 customs declarations for goods brought in through the Netherlands between December 27, 2013, and December 2, 2016, in which Parcel underreported the value of the goods. Similarly, German authorities identified

53 import declarations made on goods imported via the Netherlands by BPS between June 27, 2014, and January 2, 2017, in which BPS underreported the value of goods on customs forms.

17. In one instance on March 20, 2017, Dutch customs authorities checked a container for Parcel. On its April 18, 2017, import declaration, Parcel reported that the container contained trampolines worth USD 7,823.40. In actuality, the actual value of the goods in the container was assessed at EUR 69,625.67 (approximately USD 85,847.92). Between December 27, 2013, and January 2, 2017, this practice by Parcel and BPS resulted in more than one million Euro in unpaid customs duties and sales taxes.

18. On May 24, 2017, German authorities searched the business premises of BPS and Parcel. They seized a number of computers and other devices used by Tan and Yuen. Analyzing the computers, German authorities determined that since 2012, Tan and Yuen used the e-mail address **parcelpioneerlogistics@hotmail.de** to communicate with Zhou and Shek. In particular, German authorities identified e-mails showing that the suspects used this e-mail account to communicate about Parcel's shipment of goods and customs declarations for imports to Germany and the Netherlands as well as to arrange what the declared value of the imported goods would be and allocate monies obtained from the business.

19. In order to further investigate the scope and nature of the suspects' fraudulent customs activities, German authorities request content records for the e-mail account used by the suspects to coordinate the importation of goods and the associated customs declarations: **parcelpioneerlogistics@hotmail.de**. The e-mail provider for this account is Microsoft Corporation.

20. Based on my training, experience, and the facts of this investigation, I believe probable cause exists that the fruits, instrumentalities, and evidence of tax fraud will be found in

the Microsoft Corporation account **parcelpioneerlogistics@hotmail.de**.  Accordingly, I submit that there is probable cause to search the accounts.

21.   In general, an e-mail that is sent to a Microsoft Corporation subscriber is stored in the subscriber's "mail box" on Microsoft Corporation's servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Microsoft Corporation's servers indefinitely.  Even if the subscriber deletes the e-mail, it may continue to be available on Microsoft Corporation's servers for a certain period of time.

## BACKGROUND CONCERNING E-MAIL

22.   In my training and experience, I have learned that Microsoft Corporation provides a variety of on-line services, including e-mail access, to the public.  Microsoft Corporation allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account(s) listed in Attachment A.  Subscribers obtain an account by registering with Microsoft Corporation. During the registration process, Microsoft Corporation asks subscribers to provide basic personal information.  Therefore, the computers of Microsoft Corporation are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Microsoft Corporation subscribers) and information concerning subscribers and their use of Microsoft Corporation services, such as account access information, e-mail transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

23.   A Microsoft Corporation subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Microsoft

7

Corporation. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

24. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often nevertheless provides clues to their identity, location, or illicit activities.

25. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular log-ins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

26. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

27. As explained herein, information stored in connection with an e-mail account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating officials to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with an e-mail account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the e-mail provider can show how and when the account was accessed or used. For example, e-mail providers typically log the IP addresses from which users access the e-mail account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or

exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the e-mail account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

28.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Microsoft Corporation who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

                      Respectfully submitted,

                      _____
                      Addie C. Gilestra
                      Special Agent
                      Federal Bureau of Investigation

Subscribed and sworn to before me on _____, 201___

_____

UNITED STATES MAGISTRATE JUDGE

10

**Annex**

**Relevant Provisions of German Law**

**Section 370 of the German Fiscal Code (AO)**

(1) A penalty of up to five years' imprisonment or a monetary fine shall be imposed on any person who
> 1. furnishes the revenue authorities or other authorities with incorrect or incomplete particulars concerning matters of substantial significance for taxation,
> 2. fails to inform the revenue authorities of facts of substantial significance for taxation when obliged to do so, or
> 3. fails to use revenue stamps or revenue stamping machines when obliged to do so and as a result understates taxes or derives unwarranted tax advantages for himself or for another person.

(6) Subsections (1) to (5) above shall apply even where the act relates to import or export duties which are administered by another Member State of the European Communities or to which a Member State of the European Free Trade Association or a country associated therewith is entitled. The same shall apply where the act relates to value-added taxes or harmonized excise duties on goods designed in Article 1(1) of Council Directive 2008/118/EC of December 16, 2008, concerning the general arrangements for excise duty and repealing Directive 92/12/EEC (Official Journal L 9 of 1/14/2009, page 12) which are administered by another Member State of the European Union.

**Section 373 of the German Fiscal Code (AO)**

(1) Whoever evades import or export duties on a commercial basis or who illegally imports, exports or transports goods on a commercial basis in contravention of monopoly regulations shall be subject to imprisonment for a period of six months to 10 years. In less serious cases, the penalty shall be imprisonment for up to five years or a monetary fine.
(2) The same punishment shall also be imposed on any person who
> 3. as a member of a group formed for the purpose of repeatedly evading import or export duties or of illegally importing, exporting or transporting goods, commits such an act.

(4) Section 370(6), first sentence, and (7) shall apply accordingly.

2

**Section 53 of the German Criminal Code (StGB)**

(1) If a person has committed more than one offense, all of which are to be adjudicated at the same time, and incurred more than one sentence of imprisonment or more than one fine, an aggregate sentence shall be imposed.
(2) If a term of imprisonment concurs with a fine, an aggregate sentence shall be imposed. The court may impose a separate fine; if fines are to be imposed for more than one offense, an aggregate fine shall to that extent be imposed.
(3) Section 52 subsections 3 and 4 shall apply mutatis mutandis.

## ATTACHMENT A
**Property to Be Searched**

This warrant applies to information associated with **parcelpioneerlogistics@hotmail.de** that is stored at premises controlled by Microsoft Corporation, a company that accepts service of legal process at One Microsoft Way, Redmond, Washington, 98052.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I. **Information to be disclosed by Microsoft Corporation (the "Provider") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any e-mails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A ("the Account"):

a.   The contents of all e-mails associated with each Account, dating from January 1, 2012, to and including, May 24, 2017, including stored or preserved copies of e-mails sent to and from the Account, e-mail attachments, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.   All records or other information regarding the identification of each Account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the Account was created, the length of service, the IP address used to register the Account, log-in IP addresses associated with session times and dates from January 1, 2012, to and including, May 24, 2017, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   The types of service utilized;

  d. All records or other information dating from January 1, 2012, to and including, May 24, 2017, including address books, contact and buddy lists, calendar data, pictures, and files;

  e. All records pertaining to communications between the Provider and any person regarding the Account, including contacts with support services and records of actions taken**.**

 The Provider shall deliver the information set forth above via United States mail or courier to: Supervisory Special Agent Robert Basanez, Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 7848, 935 Pennsylvania Ave., NW, Washington D.C. 20535-0001; HQ_ISP_MLAT_RETURNS@FBI.GOV.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of criminal laws of Germany, specifically sections 370 and 373 of the German Fiscal Code and section 53 of the German Criminal Code, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) E-mails, posts, messages, discussions, video, photographs, recordings, images, or communications of any kind relating to the importation of goods, customs and/or tax declarations, and/or the distribution of money related to this fraud scheme;

(b) Evidence indicating how and when each Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account owner;

(c) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(d) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

**III.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court.